UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

D.B. ZWIRN SPECIAL OPPORTUNITIES
FUND LP, a Delaware limited partnership, in its
separate capacities as Asset Based Collateral Agent,
Tranche A Collateral Agent and Tranche B
Collateral Agent,

                    Plaintiff,

        v.

DEL CASTELLO GALLERY, INC. (f/k/a
MDC Vacuum Products Corporation), a California
Corporation, and MICHAEL DEL CASTELLO

                    Defendants.



08 Civ. _CV_ (  )3044

**COMPLAINT**



        Plaintiff D.B. Zwirn Special Opportunities Fund L.P. ("DBZ"), in its separate

capacities as Asset Based Collateral Agent, Tranche A Collateral Agent and Tranche B

Collateral Agent under that certain Amended and Restated Credit and Guaranty Agreement dated

as of December 15, 2006, among MDC Vacuum Products, LLC ("MDC"), MDC Holding

Investments, LLC ("Holdings"), DBZ, and the lenders from time to time party thereto (the

"Amended Credit Agreement"), by its attorneys, as and for its Complaint against defendants Del

Castello Gallery, Inc. (f/k/a MDC Vacuum Products Corporation) ("DCG") and Michael Del

Castello ("Del Castello" and together with DCG, "Defendants"), alleges as follows:

## NATURE OF ACTION

        1.      This is a civil action for breach of contract, or in the alternative for money

had and received.

        2.      This lawsuit arises out of breaches of (i) a certain Seller Note and Put

Option Subordination Agreement, dated December 9, 2005, by and among DCG, Holdings and

DBZ (the "Seller Note and Put Option Subordination Agreement") and (ii) a certain Consulting Fee Subordination Agreement, dated December 9, 2005, by and among Del Castello, Holdings and DBZ (the "Consulting Fee Subordination Agreement" and together with the Seller Note and Put Option Subordination Agreement, the "Subordination Agreements").

3.     Under these Subordination Agreements, Defendants agreed not to receive or accept certain payments from MDC and Holdings while Events of Default had occurred and were continuing under a Credit and Guaranty Agreement dated as of December 9, 2005, among MDC, Holdings, DBZ, and the lenders from time to time party thereto (the "Lenders"), as amended (the "Credit Agreement").  Defendants also agreed that if they did receive or accept such payments, they would segregate them and hold them in trust for DBZ's benefit, and promptly pay them over and deliver them to DBZ.

4.     Defendants are in breach of the Subordination Agreements.  Since April 29, 2007, Events of Default have occurred and been continuing under the Credit Agreement, as amended.  Despite these Events of Default, Defendants have received and accepted payments from MDC and Holdings, and have refused to pay over and distribute those funds to DBZ.

5.     By reason of the foregoing, DBZ seeks specific performance of Defendants' obligations under the Subordination Agreements, and such other relief as the Court deems appropriate.

6.     In the alternative, DBZ seeks the return of the funds belonging to it pursuant to the equitable doctrine of money had and received.

## THE PARTIES

7.     DBZ is a Delaware limited partnership with its principal place of business located in New York, New York.

8.    DCG is a California corporation with its principal place of business located in Vancouver, Washington.

9.    Upon information and belief, Del Castello is a citizen of the state of Washington and resides at 5401 SE Scenic Lane Unit 104, Vancouver, Washington 98661.

## JURISDICTION AND VENUE

10.    This Court has subject matter jurisdiction over this cause pursuant to 28 U.S.C. § 1332, as there exists complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

11.    This Court has personal jurisdiction over Defendants because they explicitly agreed, in each of the Subordination Agreements, to submit to the jurisdiction of this Court for all actions or proceedings in any way, matter or respect arising out of or from the Subordination Agreements, and because the Subordination Agreements were negotiated and executed, in part, in New York.

12.    Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(a) and pursuant to Defendants' express waiver of any defense of forum non conveniens for all actions or proceedings in any way, matter or respect arising out of or from the Subordination Agreements.

# FACTS

## I.    THE MDC TRANSACTION AGREEMENTS

13.    On or about December 9, 2005, MDC, Holdings, DBZ and the Lenders entered into the Credit Agreement in connection with DCG's sale of all of the issued and outstanding limited liability company interests of MDC to Holdings. Pursuant to the Credit Agreement, DBZ agreed to extend loans to MDC and Holdings agreed to guarantee MDC's Obligations (as defined in the Credit Agreement).

14.    Contemporaneously with the execution of the Credit Agreement, on December 9, 2005, (i) DCG was issued an unsecured subordinated promissory note in the principal sum of Three Million Seven Hundred and Fifty Thousand Dollars ($3,750,000) (the "Seller Note"), (ii) Holdings and DCG entered into a put option agreement (the "Put Option Agreement"), and (iii) Holdings entered into a consulting agreement with Del Castello pursuant to which Del Castello was engaged as a consultant by Holdings (the "Del Castello Consulting Agreement").

15.    Pursuant to the Seller Note, Holdings agreed to make principal and interest payments on the note to DCG.

16.    Pursuant to the Put Option Agreement, Holdings agreed to grant DCG the option to cause certain interests in Holdings owned by DCG to be repurchased by Holdings under certain terms and conditions.

17.    Pursuant to the Del Castello Consulting Agreement, MDC agreed to pay consulting fees to Del Castello.

18.    On or about December 15, 2006, MDC, Holdings, DBZ and the Lenders entered into the Amended Credit Agreement, which amended certain terms of the Credit Agreement.

## II.    THE SUBORDINATION AGREEMENTS

19.    Also in connection with the MDC sale transaction, on or about December 9, 2005, DCG, Holdings, and DBZ executed the Seller Note and Put Option Subordination Agreement, and Del Castello, Holdings, and DBZ executed the Consulting Fee Subordination Agreement. A true and correct copy of the Seller Note and Put Option Subordination Agreement is attached hereto as Exhibit 1. A true and correct copy of the Consulting Fee Subordination Agreement is attached hereto as Exhibit 2.

20.    Pursuant to the Subordination Agreements, Defendants agreed that payments made to them under the Seller Note, Put Option Agreement, and Del Castello Consulting Agreement (referred to in the Subordination Agreements as the "Subordinated Debt," the "Subordinated Put Option Amount," and the "Subordinated Fees," respectively) were and would be "subordinate and rendered junior in right of payment" to the prior indefeasible payment in full in cash of all Senior Debt (as defined in each of the Subordination Agreements), including of any and all amounts outstanding under the Credit Agreement.

21.    The Subordination Agreements specifically provided that the rights and obligations of the parties to the Subordination Agreements would not be affected by the amendment of the Credit Agreement.

22.    The Subordination Agreements also provided that DBZ was authorized to demand specific performance of the Subordination Agreements.

23.    The Subordination Agreements were entered into for the direct benefit of DBZ and the Lenders.

24.    Under Section 2.01(c) of the Seller Note and Put Option Subordination Agreement, DCG agreed to not receive or accept any payment in respect of any Subordinated Debt or Subordinated Put Option Amount if any Event of Default under the Credit Agreement

occurred and was continuing, unless and until (i) the Senior Debt had been paid in full in cash, (ii) such Event of Default had been cured or waived in accordance with the Credit Agreement, or (iii) DBZ had otherwise consented in writing.

25.    Under Section 2.01(b) of the Seller Note and Put Option Subordination Agreement, if Holdings made or DCG received any payment in respect of Subordinated Debt or Subordinated Put Options Amounts in contravention of section 2.01(c), then DCG was required to (1) segregate, receive and hold in trust such payments and (2) promptly pay and deliver such payments to DBZ.

26.    Under Section 2.01(c) of the Consulting Fee Subordination Agreement, Del Castello agreed not to receive or accept any payment in respect of any Subordinated Fees if any Event of Default under the Credit Agreement occurred and was continuing, unless and until (i) the Senior Debt had been paid in full in cash, (ii) such Event of Default had been cured or waived in accordance with the Credit Agreement, or (iii) DBZ had otherwise consented in writing.

27.    Under Section 2.01(b) of the Consulting Fee Subordination Agreement, if Holdings made or Del Castello received any payment in respect of Subordinated Fees in contravention of section 2.01(c), then Del Castello was required to (1) segregate, receive and hold in trust such payments and (2) promptly pay and deliver such payments to DBZ.

III.    **DEFENDANTS' BREACH OF THE SUBORDINATION AGREEMENTS**

28.    Since no later than April 29, 2007, numerous Events of Default have occurred and been continuing under the Amended Credit Agreement.

29.    DBZ, in its capacity as Administrative Agent under the Amended Credit Agreement, has given notice of those Events of Default to MDC and Holdings.

30.    Upon information and belief, since April 29, 2007, DCG has received and accepted payments of Subordinated Debt and Subordination Put Option Amounts totaling approximately $257,343.75.

31.    Upon information and belief, since April 29, 2007, Del Castello has received and accepted payments of Subordinated Fees totaling approximately $150,000.03.

32.    The Senior Debt has not been paid in full in cash.  Specifically, as of the date hereof, Obligations (as defined in the Amended Credit Agreement) in a principal amount in excess of $33,282,634.16 are currently owing under the Amended Credit Agreement by MDC to DBZ and the Lenders.

33.    DBZ did not otherwise consent in writing to Defendants' receipt, acceptance, or retention of the payments referred to in paragraphs 30 and 31.

34.    By letter dated as of and sent on or about January 30, 2008, DBZ, in its capacity as Administrative Agent under the Amended Credit Agreement, informed Defendants that Events of Default had occurred and were continuing under the Amended Credit Agreement, and specifically reserved the right to demand payment over and delivery of any payment in respect of Subordinated Debt, Subordinated Put Option Amount, and/or Subordinated Fees that had been paid to Defendants by Holdings or MDC.

35.    By letter dated as of and sent on or about March 20, 2008, DBZ demanded that Defendants pay over and deliver to DBZ all monies received and accepted by them as payment in respect of Subordinated Debt, Subordinated Put Amounts, and/or Subordinated Fees since April 29, 2007.

7

36.     Defendants refused to comply with DBZ's demand, and have not paid over and delivered any of the monies received and accepted by them as payment in respect of Subordinated Debt, Subordinated Put Amounts, and/or Subordinated Fees.

## COUNT I

### (Breach of Contract as to DCG)

37.     DBZ realleges and incorporates by reference Paragraphs 1 through 36 of this Complaint as if fully set forth herein.

38.     Pursuant to the Seller Note and Put Option Subordination Agreement, DCG was not permitted to receive, accept or retain payment in respect of any Subordinated Debt or Subordinated Put Option Amounts if any Event of Default under the Credit Agreement occurred and was continuing, unless and until (i) Senior Debt had been paid in full in cash, (ii) such Event of Default had been cured or waived in accordance with the Credit Agreement, or (iii) DBZ had otherwise consented in writing.

39.     DCG breached the Seller Note and Put Option Subordination Agreement by accepting payments of Subordinated Debt and/or Subordinated Put Option Amounts totaling approximately $257,343.75 since April 29, 2007, despite the occurrence and continuance of Events of Default under the Amended Credit Agreement.

40.     DCG further breached the Seller Note and Put Option Subordination Agreement by refusing to pay over and deliver those payments to DBZ.

41.     DBZ has complied with all of its obligations pursuant to the Amended Credit Agreement and the Seller Note and Put Option Subordination Agreement.

42.    DBZ is entitled to specific performance of DCG's obligation under the Seller Note and Put Option Subordination Agreement to pay over and deliver payments received in respect of any Subordinated Debt or Subordinated Put Option Amounts since April 29, 2007.

## COUNT II

### (Breach of Contract as to Del Castello)

43.    DBZ realleges and incorporates by reference Paragraphs 1 through 42 of this Complaint as if fully set forth herein.

44.    Pursuant to the Consulting Fee Subordination Agreement, Del Castello was not permitted to receive, accept or retain payment in respect of any Subordinated Fees if any Event of Default under the Credit Agreement occurred and was continuing, unless and until (i) Senior Debt had been paid in full in cash, (ii) such Event of Default had been cured or waived in accordance with the Credit Agreement, or (iii) DBZ had otherwise consented in writing.

45.    Del Castello breached the Consulting Fee Subordination Agreement by accepting payments of Subordinated Fees totaling approximately $150,000.03 since April 29, 2007, despite the occurrence and continuance of Events of Default under the Amended Credit Agreement.

46.    Del Castello further breached the Consulting Fee Subordination Agreement by refusing to pay over and deliver those payments to DBZ.

47.    DBZ has complied with all of its obligations pursuant to the Credit Agreement and the Consulting Fee Subordination Agreement.

48.    DBZ is entitled to specific performance of Del Castello's obligation under the Consulting Fee Subordination Agreement to pay over and deliver payments received in respect of any Subordinated Fees since April 29, 2007.

## COUNT III

### (Money Had And Received as to DCG and Del Castello)

49.     DBZ realleges and incorporates by reference Paragraphs 1 through 48 of this Complaint as if fully set forth herein.

50.     In receiving and accepting payments in respect of Subordinated Debt, Subordinated Put Option Amounts, and Subordinated Fees, DCG and Del Castello took possession of funds belonging to DBZ.

51.     DCG and Del Castello benefited from the receipt, acceptance and retention of these funds.

52.     Under principles of good conscience, DCG and Del Castello should not be permitted to retain possession of these funds.

53.     As a result of DCG and Del Castello's acts, DBZ has been damaged in an amount no less than $407,343.78.

## PRAYER FOR RELIEF

WHEREFORE, DBZ respectfully requests that the Court enter an Order on its behalf against Defendants:

A.     Directing the specific performance of DCG's obligation under the Seller Note and Put Option Subordination Agreement to pay over and deliver payments received in respect of any Subordinated Debt or Subordinated Put Option Amounts since April 29, 2007, or in the alternative directing DCG to return such payments it is inequitably possessing;

B.     Directing the specific performance of Del Castello's obligation under the Consulting Fee Subordination Agreement to pay over and deliver payments received in respect

of any Subordinated Fees since April 29, 2007, or in the alternative directing Del Castello to return such payments he is inequitably possessing;

      C.     For all reasonable costs associated with the wrongful withholding by Defendants of the payments due and owing to DBZ;

      D.     For pre-judgment interest on all costs and damages at the maximum rate allowed by law from the time DBZ incurred the costs and damages;

      E.     For any and all additional damages DBZ has incurred;

      F.     For DBZ's reasonable and necessary costs incurred in connection with this action;

      G.     For accrued interest on the amount of the judgment as provided by law; and

      H.     For such other and further legal, equitable or other relief as this Court deems just and proper.

Dated: March 25, 2008              LATHAM & WATKINS LLP
New York, New York

                                By: _George Royle V_
                                  George Royle V
                                  885 Third Avenue
                                  New York, New York 10022
                                  (212) 906-1200

                                Attorneys for D.B. Zwirn Special
                                  Opportunities Fund L.P.

EXHIBIT ONE

EXECUTION COPY

---

SELLER NOTE AND PUT OPTION SUBORDINATION AGREEMENT

dated as of December 9, 2005

among

DEL CASTELLO GALLERY, INC.
(f/k/a MDC VACUUM PRODUCTS CORPORATION)

as Subordinated Creditor

MDC HOLDING INVESTMENTS, LLC,
as Holdings

and

D.B. ZWIRN SPECIAL OPPORTUNITIES FUND L.P.,
in its separate capacities as Asset Based Collateral Agent, Tranche A Collateral Agent
and Tranche B Collateral Agent

---

# TABLE OF CONTENTS

PAGE

ARTICLE I DEFINITIONS ...................................................................................................... 1

    Section 1.01    General Definitions.............................................................................1
    Section 1.02    Definitions; Interpretation..................................................................3

ARTICLE II SUBORDINATION .............................................................................................. 3

    Section 2.01    Agreement to Subordinate ................................................................3
    Section 2.02    In Furtherance of Subordination ......................................................4
    Section 2.03    No Enforcement or Commencement of Any Proceedings...............6
    Section 2.04    Rights of Subrogation .......................................................................6
    Section 2.05    Subordination Legend; Further Assurances.....................................6
    Section 2.06    No Change in or Disposition of Subordinated Debt or
                       Subordinated Put Option Amounts ..................................................7
    Section 2.07    Agreement by Holdings ....................................................................7
    Section 2.08    Obligations Hereunder Not Affected ...............................................7

ARTICLE III MISCELLANEOUS. ........................................................................................... 8

    Section 3.01    Notices ..............................................................................................8
    Section 3.02    Miscellaneous .................................................................................10
    Section 3.03    APPLICABLE LAW .......................................................................11
    Section 3.04    CONSENT TO JURISDICTION.....................................................11
    Section 3.05    WAIVER OF JURY TRIAL............................................................11

EXHIBIT A — PUT OPTION AGREEMENT

This SELLER NOTE AND PUT OPTION SUBORDINATION AGREEMENT, dated as of December 9, 2005 (this "Agreement"), among DEL CASTELLO GALLERY, INC., a California corporation f/k/a MDC Vacuum Products Corporation (the "Subordinated Creditor"), MDC HOLDING INVESTMENTS, LLC, a Delaware limited liability company ("Holdings") and D.B. ZWIRN SPECIAL OPPORTUNITIES FUND L.P., in its separate capacities as Asset Based Collateral Agent for the Asset Based Secured Parties (as herein defined) (in such capacity, the "Asset Based Collateral Agent"), as Tranche A Collateral Agent for the Tranche A Secured Parties (as herein defined) (in such capacity, the "Tranche A Collateral Agent") and as Tranche B Collateral Agent for the Tranche B Secured Parties (in such capacity, the "Tranche B Collateral Agent" and, together with the Asset Based Collateral Agent and the Tranche B Collateral Agent, the "Collateral Agents").

RECITALS:

WHEREAS, reference is made to that certain Credit and Guaranty Agreement, dated as of the date hereof (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among Holdings, MDC VACUUM PRODUCTS, LLC, a Delaware limited liability company ("Borrower"), the Lenders party thereto from time to time (the "Lenders"), and D.B. ZWIRN SPECIAL OPPORTUNITIES FUND, L.P., as Administrative Agent (the "Administrative Agent") and in its separate capacities as Asset Based Collateral Agent, Tranche A Collateral Agent and Tranche B Collateral Agent;

WHEREAS, in consideration of the extensions of credit and other accommodations of Lenders as set forth in the Credit Agreement, Subordinated Creditor has agreed to subordinate to the Senior Debt (as defined below) all payments under that certain promissory note dated as of even date herewith evidencing indebtedness of Holdings to Subordinated Creditor in the original principal amount of $3,750,000 (the "Subordinated Note");

WHEREAS, pursuant to that certain Put Option Agreement, dated as of the date hereof, in substantially the form attached hereto as Exhibit A (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Put Option Agreement") by and among Holdings and Subordinated Creditor, Holdings has agreed to grant the Subordinated Creditor the 'Put Option' (as defined therein) upon the terms and subject to the conditions set forth therein;

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, Subordinated Creditor, Holdings and the Collateral Agent agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01        General Definitions.  In this Agreement, the following terms shall have the following meanings:

"Agreement" shall have the meaning set forth in the preamble.

"Asset Based Collateral Agent" shall have the meaning set forth in the preamble.

"Asset Based Secured Parties" means the Lenders of Asset Based Loans and shall include, without limitation, all former Lenders of Asset Based Loans to the extent that any Senior Debt owing to such Persons was incurred while such Persons were Lenders of Asset Based Loans and such Senior Debt has not been paid or satisfied in full.

"Borrower" shall have the meaning set forth in the preamble.

"Credit Agreement" shall have the meaning set forth in the recitals.

"Credit Documents" shall have the meaning specified in the Credit Agreement.

"Event of Default" means each of the conditions or events set forth in Section 8.01 of the Credit Agreement.

"Holdings" shall have the meaning set forth in the recitals.

"Lien" shall mean any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

"Proceeds" shall mean: (i) all "proceeds" as defined in Article 9 of the UCC and (ii) whatever is receivable or received when Collateral or proceeds are sold, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

"Put Option Agreement" shall have the meaning set forth in the recitals.

"Record" shall have the meaning specified in Article 9 of the UCC.

"Secured Parties" shall mean the Asset Based Secured Parties, the Tranche A Secured Parties and the Tranche B Secured Parties and "Secured Party" shall mean any of them.

"Senior Debt" shall mean all obligations, liabilities and indebtedness of every nature of Holdings from time to time owed to the Administrative Agent, the Collateral Agents or any Secured Party under the Credit Documents, including, without limitation, the principal amount of all debts, claims and indebtedness, accrued and unpaid interest and all fees, costs and expenses, whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, now and from time to time hereafter owing, due or payable, whether before or after the filing of a petition initiating any proceeding referred to in Section 2.02(a), together with (a) any amendments, modifications, renewals, extensions or refinancings thereof or of indebtedness or other obligations such Senior Debt supports and (b) any interest accruing after the filing of a petition initiating any proceeding referred to in Section 2.02(a), whether or not allowed as a claim in such proceeding. Senior Debt shall be considered to be outstanding whenever any loan or loan commitment under the Credit Agreement is outstanding.

"Subordinated Debt" shall mean any and all future Indebtedness owing to Subordinated Creditor under and in respect of the Subordinated Note and interest, premiums and fees, if any, thereon and other amounts payable in respect thereof and all rights and remedies of Subordinated Creditor with respect thereto.

"Subordinated Note" shall have the meaning set forth in the recitals.

2

"Subordinated Put Option Amount" shall mean any and all future amounts owing to Subordinated Creditor under and in respect of the Put Option Agreement (including, without limitation, any and all future amounts payable to Subordinated Creditor in connection with the exercise of the Put Option (as defined in the Put Option Agreement)) and all rights and remedies of Subordinated Creditor with respect thereto.

"Tranche A Collateral Agent" shall have the meaning set forth in the preamble.

"Tranche A Secured Parties" means the Lenders of Tranche A Term Loans and shall include, without limitation, all former Lenders of Tranche A Term Loans to the extent that any Senior Debt owing to such Persons was incurred while such Persons were Lenders of Tranche A Term Loans and such Senior Debt has not been paid or satisfied in full.

"Tranche B Collateral Agent" shall have the meaning set forth in the preamble.

"Tranche B Secured Parties" means the Lenders of Tranche B Term Loans and shall include, without limitation, all former Lenders of Tranche B Term Loans to the extent that any Senior Debt owing to such Persons was incurred while such Persons were Lenders of Tranche B Term Loans and such Senior Debt has not been paid or satisfied in full.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York or, when the context implies, the Uniform Commercial Code as in effect from time to time in any other applicable jurisdiction.

"United States" shall mean the United States of America.

Section 1.02    Definitions; Interpretation.  All capitalized terms used herein (including the preamble and recitals hereto) and not otherwise defined herein shall have the meanings ascribed thereto in the Credit Agreement or, if not defined therein, in the UCC. References to "Sections," "Exhibits" and "Schedules" shall be to Sections, Exhibits and Schedules, as the case may be, of this Agreement unless otherwise specifically provided.  Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect. Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference.  The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not nonlimiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter.  If any conflict or inconsistency exists between this Agreement and the Credit Agreement, the Credit Agreement shall govern.  All references herein to provisions of the UCC shall include all successor provisions under any subsequent version or amendment to any Article of the UCC.

ARTICLE II

SUBORDINATION

Section 2.01    Agreement to Subordinate.

3

(a)     Each of Holdings and Subordinated Creditor agrees that the Subordinated Debt and Subordinated Option Amounts are and shall be "subordinate and rendered junior in right of payment" to the prior indefeasible payment in full in cash of all Senior Debt to the extent and in the manner set forth herein. For purposes of this Agreement, "subordinate and rendered junior in right of payment" means that no part of the Subordinated Debt or Subordinated Put Option Amounts shall have any claim to the assets of Holdings on a parity with or prior to the claim of the Senior Debt. Moreover, the Senior Debt shall not be deemed to have been paid in full in cash until the Secured Parties shall have received full payment in respect of the Senior Debt in cash, which payment shall have been retained by the Secured Parties for a period of time in excess of all applicable preference or other similar periods under applicable bankruptcy, insolvency or creditors' rights laws. Each of Holdings and Subordinated Creditor waives notice of acceptance of this Agreement by the Secured Parties, and Subordinated Creditor waives notice of and consent to the making, amount and terms of the Senior Debt that may exist or be created from time to time and any renewal, extension, amendment, modification or refinancing thereof or of indebtedness or other obligations such Senior Debt supports, and any other lawful action that any Secured Party, in its sole and absolute discretion, may take or omit to take with respect thereto. The provisions of this Section 2.01(a) shall constitute a continuing offer made for the benefit of and to Collateral Agent and all Secured Parties.

(b)     In the event that Holdings shall make, and/or Subordinated Creditor shall receive, any payment of Subordinated Debt or Subordinated Put Option Amounts in contravention of this Agreement, then and in any such event such payment shall be deemed to be the property of, segregated, received and held in trust for the benefit of and shall be promptly paid over and delivered to the Collateral Agents for the pro rata benefit of the Secured Parties; provided however that any such payment made by Holdings in good faith without actual or constructive knowledge that it contravenes the provisions of this Agreement shall not constitute an Event of Default under the Credit Documents if such payment is segregated, received, held and paid over to the Collateral Agents in compliance with this Section 2.01(b) and Section 2.02(c).

(c)     Holdings shall not make, and Subordinated Creditor shall not receive or accept, any payment in respect of any Subordinated Debt or Subordinated Put Option Amounts if any Event of Default under the Credit Agreement has occurred and is continuing or would result therefrom, unless and until (i) the Senior Debt has been paid in full in cash, (ii) such Event of Default has been cured or waived in accordance with the Credit Agreement, or (iii) Collateral Agents have otherwise consented in writing.

Section 2.02     In Furtherance of Subordination.

(a)     Upon any distribution of all or any of Holdings' assets in the event of:

(i)     any insolvency or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding in connection therewith, relative to Holdings, or to its creditors, as such, or to its assets,

(ii)     any liquidation, dissolution or other winding up of Holdings, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy, or

4

(iii)    any assignment for the benefit of creditors or any other marshalling of assets and liabilities of Holdings,

then, and in any such event, unless the Collateral Agents shall otherwise agree in writing, the Secured Parties shall receive payment in full in cash of all amounts due or to become due (whether or not any Senior Debt has been declared due and payable prior to the date on which such Senior Debt would otherwise have become due and payable) on or in respect of all Senior Debt (including post-petition interest), and before Subordinated Creditor or anyone claiming through or on his behalf (including any receiver, trustee, or otherwise) are entitled to receive any payment on account of principal of (or premium, if any) or interest on or other amounts payable in respect of the Subordinated Debt or Subordinated Put Option Amounts, and to that end, any payment or distribution of any kind or character, whether in cash, property or securities, which may be payable or deliverable in respect of the Subordinated Debt or Subordinated Put Option Amounts in any such case, proceeding, dissolution, liquidation or other winding up or event, shall be paid or delivered directly to the Collateral Agents for the application (in the case of cash) to, or as collateral (in the case of non-cash property or securities) for, the payment or prepayment of the Senior Debt on a pro rata basis to the Secured Parties until the Senior Debt shall have been indefeasibly paid in full in cash.

(b)    If any proceedings, liquidation, dissolution or winding up referred to in clause (a) above is commenced by or against Holdings,

(i)    Each Collateral Agent is hereby irrevocably authorized and empowered (in its own name or in the name of Holdings, Subordinated Creditor or otherwise), but shall have no obligation, to demand, sue for, collect and receive every payment or distribution in respect of the Subordinated Debt or Subordinated Put Option Amounts above and give acquittance therefor and to file claims and proofs of claim and take such other action (including voting the Subordinated Debt or Subordinated Put Option Amounts) as the Collateral Agent may reasonably deem necessary or advisable for the exercise or enforcement of any of the rights or interests of the Collateral Agent hereunder; provided that, in the event the Collateral Agent takes such action, the Collateral Agent shall apply all proceeds first to the payment of the costs of enforcement of this Agreement, and second to the pro rata payment of the Senior Debt; and

(ii)    Subordinated Creditor shall duly and promptly take such action as Collateral Agents may reasonably request (A) to collect the Subordinated Debt or Subordinated Put Option Amounts for the account of Collateral Agents and to file appropriate claims or proofs of claim in respect of the Subordinated Debt or Subordinated Put Option Amounts, (B) to execute and deliver to Collateral Agents such powers of attorney, assignments, or other instruments as Collateral Agents may reasonably request to enable them to enforce any and all claims with respect to the Subordinated Debt or Subordinated Put Option Amounts, and (C) to collect and receive any and all payments or distributions that may be payable or deliverable on or with respect to the Subordinated Debt or Subordinated Put Option Amounts.

(c)    All payments or distributions of assets of Holdings, whether in cash, property or securities on or with respect to the Subordinated Debt or Subordinated Put Option Amounts that are received by Subordinated Creditor contrary to the provisions of this

NY 1087225.6

Agreement shall be deemed to be the property of, segregated, received and held in trust for the benefit of and shall be promptly paid over and delivered, in the same form as so received (with any necessary endorsement), to the Collateral Agents for the pro rata benefit of the Secured Parties, and, after being paid over and delivered, in the same form as so received (with any necessary endorsement), to the Collateral Agents such amounts shall be deemed not to have been paid to Subordinated Creditor. Notwithstanding any other provision of this Agreement, Subordinated Creditor's rights as a member of Holdings including its right to distributions as a member (other than upon exercise of the Put Option) are in no way affected by this Agreement.

(d)    Subordinated Creditor shall not initiate, prosecute or participate in any claim, action or other proceeding challenging the enforceability, validity, perfection or priority of the Senior Debt or any liens or security interests securing the Senior Debt.

(e)    Each Collateral Agent is hereby authorized to demand specific performance of this Agreement, whether Holdings or Subordinated Creditor shall have complied with any of the provisions hereof applicable to it, at any time when Subordinated Creditor or any one of them shall have failed to comply with any of the provisions of this Agreement applicable to it. Subordinated Creditor hereby irrevocably waives any defense (other than the defense of payment in full of the Senior Debt) based on the adequacy of a remedy at law which might be asserted as a bar to such remedy of specific performance.

Section 2.03    No Enforcement or Commencement of Any Proceedings. Subordinated Creditor agrees that, until the Senior Debt is indefeasibly paid in full in cash and all commitments to lend under the Credit Documents are terminated, it will not accelerate the maturity of the Subordinated Debt, sue to enforce any right with respect thereto or commence, or join with any creditor other than the Secured Parties in commencing any proceeding referred to in Section 2.02(a).

Section 2.04    Rights of Subrogation. Subordinated Creditor agrees that no payment or distribution to any Collateral Agent or Secured Parties pursuant to the provisions of this Agreement shall entitle Subordinated Creditor to exercise any rights of subrogation in respect thereof until all Senior Debt has been paid in full in cash. Subordinated Creditor agrees that the subordination provisions contained herein shall not be affected by any action, or failure to act, by any Collateral Agent or any Secured Party that results, or may result, in affecting, impairing or extinguishing any right of reimbursement or subrogation or other right or remedy of Subordinated Creditor against Holdings.

Section 2.05    Subordination Legend; Further Assurances.

(a)    Subordinated Creditor and Holdings will cause the Subordinated Note to be endorsed with a legend substantially as follows:

"PAYMENT OF THE PRINCIPAL OF, AND INTEREST ON, THIS SUBORDINATED NOTE IS EXPRESSLY SUBORDINATED AND SUBJECT IN RIGHT OF PAYMENT TO THE PRIOR PAYMENT IN FULL OF CERTAIN SENIOR DEBT PURSUANT TO, AND TO THE EXTENT PROVIDED IN SELLER NOTE AND PUT OPTION SUBORDINATION AGREEMENT DATED AS OF DECEMBER 9, 2005, AMONG HOLDINGS, SUBORDINATED CREDITOR AND D.B. ZWIRN SPECIAL OPPORTUNITIES FUND L.P."

6

        (b)     Subordinated Creditor and Holdings will cause the Put Option Agreement to be endorsed with a legend substantially as follows:

"PAYMENTS OF THE PURCHASE PRICE AND ALL OTHER AMOUNTS PAYABLE HEREUNDER ARE EXPRESSLY SUBORDINATED AND SUBJECT IN RIGHT OF PAYMENT TO THE PRIOR PAYMENT IN FULL OF CERTAIN SENIOR DEBT PURSUANT TO, AND TO THE EXTENT PROVIDED IN, THE SELLER NOTE AND PUT OPTION SUBORDINATION AGREEMENT DATED AS OF DECEMBER 9, 2005, AMONG HOLDINGS, SUBORDINATED CREDITOR AND D.B. ZWIRN SPECIAL OPPORTUNITIES FUND L.P."

Each of Holdings and Subordinated Creditor will at its own expense and at any time and from time to time promptly execute and deliver all further instruments and documents and take all further action that may be necessary or that the Collateral Agents may reasonably request to protect any right or interest granted or purported to be granted hereunder or to enable the Collateral Agents to exercise and enforce their respective rights and remedies hereunder.

        Section 2.06     <u>No Change in or Disposition of Subordinated Debt or Subordinated Put Option Amounts</u>.  Subordinated Creditor will not, without the prior written consent of the Collateral Agents:

        (a)     sell, assign, transfer, endorse, pledge, encumber or otherwise dispose of any of the Subordinated Debt or Subordinated Put Option Amounts (except under this Agreement); or

        (b)     permit the terms of any of the Subordinated Debt or Subordinated Put Option Amounts to be changed in such a manner as to have a material adverse effect on the rights or interests of the Secured Parties or the Collateral Agents.

        Section 2.07     <u>Agreement by Holdings</u>.  Holdings agrees that it will not make any payment on any of the Subordinated Debt or Subordinated Put Option Amounts, or take any other action, in contravention of the provisions of this Agreement.

        Section 2.08     <u>Obligations Hereunder Not Affected</u>.  All rights and interest of any of the Collateral Agents and Secured Parties hereunder, and all agreements and obligations of Holdings and Subordinated Creditor hereunder, shall remain in full force and effect irrespective of:

        (a)     any lack of validity or enforceability of any document evidencing Senior Debt;

        (b)     any change in the time, manner or place of payment of, or any other term of, all or any of the Senior Debt, or any other amendment or waiver of or any consent to departure from any of the documents evidencing or relating to the Senior Debt;

        (c)     any exchange, release or nonperfection of the Collateral, or any release or amendment or waiver of or consent to departure from any Credit Document, for all or any of the Senior Debt;

7

(d)     any failure of a Collateral Agent or any Secured Party to assert any claim or to enforce any right to remedy against any other party hereto under the provisions of this Agreement, the Credit Agreement, or any other Credit Document other than this Agreement;

(e)     any reduction, limitation, impairment or termination of the Senior Debt for any reason (other than the defense of payment in full of the Senior Debt), including any claim of waiver, release, surrender, alteration or compromise, and such rights and interest of any Collateral Agent or any Secured Party, and such agreements and obligations of Holdings and Subordinated Creditor, shall not be subject to (and each of Holdings and Subordinated Creditor hereby waive any right to or claim of) any defense (other than the defense of payment in full of the Senior Debt) or set-off, counterclaim, recoupment or termination whatsoever by reason of invalidity, illegality, nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Senior Debt; and

(f)     any other circumstance which might otherwise constitute a defense (other than the defense of payment in full of the Senior Debt) available to, or a discharge of, Holdings in respect of the Senior Debt or Subordinated Creditor in respect of this Agreement.

This Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Senior Debt is rescinded or must otherwise be returned by any Collateral Agent or any Secured Party upon the insolvency, bankruptcy or reorganization of Holdings or Subordinated Creditor or otherwise, all as though such payment had not been made. Subordinated Creditor acknowledges and agrees that the Collateral Agents may, in accordance with the terms of the Credit Documents, without notice or demand and without affecting or impairing Subordinated Creditor's obligations hereunder, from time to time (i) renew, compromise, extend, increase, accelerate or otherwise change the time for payment of, or otherwise change the terms of the Senior Debt, to the extent applicable, or any part thereof, including, without limitation, increase or decrease the rate of interest thereon or the principal amount thereof; (ii) take or hold security or guaranties for the payment of the Senior Debt and exchange, enforce, foreclose upon, waive and release any such security or guaranty; (iii) apply such security and direct the order or manner of sale thereof as the Collateral Agents, in their sole discretion, may determine; (iv) release and substitute one or more endorsers, warrantors, the Credit Parties (as defined in the Credit Agreement) or other obligors; and (v) exercise or refrain from exercising any rights against the Credit Parties or any other person.

## ARTICLE III

## MISCELLANEOUS.

Section 3.01     Notices.  Any notice required or permitted to be given under this Agreement shall be given as follows:

(a)     if to Subordinated Creditor, to:

Del Castello Gallery, Inc.

Attention: Michael Del Castello
5401 S.E. Scenic Lane
Unit 104

8

Vancouver, WA 98661
Telecopy No.: (360) 609-7545

(b)    if to Holdings, to:

MDC Holding Investments, LLC
23842 Cabot Blvd.
Hayward, CA 94545
Attention: Kevin Cullen
Telecopy No.: (510) 265-3615

with a copy, which shall not constitute notice, to:

Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Attention: Mitchell Cohen, Esq.
Telecopy No.: (310) 203-7199

(c)    if to the Asset Based Collateral Agent, to:

D.B. Zwirn Special Opportunities Fund, L.P.
745 Fifth Avenue, 18th Floor
New York, New York 10151
Attn: Quinn Morgan
Telecopy: (646) 720-9086
and
Attn: Li Ann Law
Telecopy No.: (646) 720-9055

with a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022-4834
Attn: Marc P. Hanrahan, Esq.
Telecopy No.: (212) 751-4864

(d)    if to the Tranche A Collateral Agent, to:

D.B. Zwirn Special Opportunities Fund, L.P.
745 Fifth Avenue, 18th Floor
New York, New York 10151
Attn: Quinn Morgan
Telecopy: (646) 720-9086
and
Attn: Li Ann Law

NY·1087225.6

Telecopy No.: (646) 720-9055

with a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, New York  10022-4834
Attn:  Marc P. Hanrahan, Esq.
Telecopy No.:  (212) 751-4864

(e)      if to the Tranche B Collateral Agent, to:

D.B. Zwirn Special Opportunities Fund, L.P.
745 Fifth Avenue, 18th Floor
New York, New York  10151
Attn:  Quinn Morgan
Telecopy:  (646) 720-9086
and
Attn:  Li Ann Law
Telecopy No.:  (646) 720-9055

with a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, New York  10022-4834
Attn:  Marc P. Hanrahan, Esq.
Telecopy No.:  (212) 751-4864

Section 3.02      Miscellaneous.  No failure or delay on the part of any
Collateral Agent in the exercise of any power, right or privilege hereunder or under any other
Credit Document shall impair such power, right or privilege or be construed to be a waiver of any
default or acquiescence therein, nor shall any single or partial exercise of any such power, right or
privilege preclude other or further exercise thereof or of any other power, right or privilege.  All
rights and remedies existing under this Agreement and the other Credit Documents are
cumulative to, and not exclusive of, any rights or remedies otherwise available.  In case any
provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any
jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or
of such provision or obligation in any other jurisdiction, shall not in any way be affected or
impaired thereby.  All covenants hereunder shall be given independent effect so that if a
particular action or condition is not permitted by any of such covenants, the fact that it would be
permitted by an exception to, or would otherwise be within the limitations of, another covenant
shall not avoid the occurrence of a Default or an Event of Default if such action is taken or
condition exists.  This Agreement shall be binding upon and inure to the benefit of the Collateral
Agents and Subordinated Creditors and their respective successors and assigns.  No Subordinated
Creditor shall, without the prior written consent of the Collateral Agents given in accordance with
the Credit Agreement, assign any right, duty or obligation hereunder.  This Agreement and the
other Credit Documents embody the entire agreement and understanding between Subordinated
Creditors and the Collateral Agents and supersede all prior agreements and understandings

NY 1087225.6

between such parties relating to the subject matter hereof and thereof. Accordingly, the Credit Documents may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties. This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.

Section 3.03    **APPLICABLE LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.**

Section 3.04    **CONSENT TO JURISDICTION. ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY HERETO ARISING OUT OF OR RELATING HEREUNDER, OR ANY OF THE OBLIGATIONS, MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY HEREUNDER, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (a) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (b) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (c) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 3.01; (d) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (c) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PARTY HERETO IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (e) AGREES EACH COLLATERAL AGENT RETAINS THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY PARTY HEREUNDER IN THE COURTS OF ANY OTHER JURISDICTION.**

Section 3.05    **WAIVER OF JURY TRIAL. EACH OF THE PARTIES HEREUNDER HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT**

NY\1087225.6

RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HEREUNDER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HEREUNDER FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 3.05 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

NY:1087225.6

IN WITNESS WHEREOF, Subordinated Creditor, Holdings and the Collateral Agents have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

DEL CASTELLO GALLERY, INC.
as Subordinated Creditor

By: _____

Name: Michael Del Castello
Title: Chairman of the Board


MDC HOLDING INVESTMENTS, LLC,
as Holdings

By: _____

Name: Joseph Brownell
Title: President and Chief Executive Officer

D.B. ZWIRN SPECIAL OPPORTUNITIES FUND, L.P.,
a Delaware limited partnership,

By: D.B. Zwirn Partners, LLC, its general partner

By: Zwirn Holdings, LLC, its managing member

as Asset Based Collateral Agent

By: _____
      Name:  Perry A. Gruss
      Title:    Chief Financial Officer


D.B. ZWIRN SPECIAL OPPORTUNITIES FUND, L.P.,
a Delaware limited partnership,

By: D.B. Zwirn Partners, LLC, its general partner

By: Zwirn Holdings, LLC, its managing member

as Tranche A Collateral Agent

By: _____
      Name:  Perry A. Gruss
      Title:    Chief Financial Officer


D.B. ZWIRN SPECIAL OPPORTUNITIES FUND, L.P.,
a Delaware limited partnership,

By: D.B. Zwirn Partners, LLC, its general partner

By: Zwirn Holdings, LLC, its managing member

as Tranche B Collateral Agent

By: _____
      Name:  Perry A. Gruss
      Title:    Chief Financial Officer

EXHIBIT A

PUT OPTION AGREEMENT

NY:1087225.6

PAYMENTS OF THE PURCHASE PRICE AND ALL OTHER AMOUNTS PAYABLE
HEREUNDER ARE EXPRESSLY SUBORDINATED AND SUBJECT IN RIGHT OF
PAYMENT TO THE PRIOR PAYMENT IN FULL OF CERTAIN SENIOR DEBT
PURSUANT TO, AND TO THE EXTENT PROVIDED IN, THE SELLER NOTE AND
PUT OPTION SUBORDINATION AGREEMENT DATED AS OF DECEMBER 9, 2005,
AMONG THE COMPANY, HOLDER AND D.B. ZWIRN SPECIAL OPPORTUNITIES
FUND L.P.

## PUT OPTION AGREEMENT

THIS PUT OPTION AGREEMENT (the "**Agreement**"), made this 9th day of
December, 2005 is entered into by and between MDC Holding Investments, LLC, a
Delaware limited liability company (the "**Company**") and Del Castello Gallery, Inc. (f/k/a
MDC Vacuum Products Corporation), a California corporation ("**Holder**").

A.      The Company, Holder, Michael Del Castello and Jose Contin are parties to a
        Contribution and Purchase Agreement dated as of December 9, 2005 (the
        "**Purchase Agreement**") pursuant to which Holder transferred substantially
        all of its assets, properties, businesses and operations to MDC Subsidiary
        and, subsequently, Holder transferred all of the limited liability company
        interests of MDC Subsidiary to the Company for consideration consisting of
        cash, a promissory note, certain other payments and 9.6 Class B Nonvoting
        Units in the Company representing approximately 9.6% of the issued and
        outstanding limited liability company interests of the Company as of the
        Closing (such Class B Nonvoting Units, and any securities or interests into
        which they are converted or exchanged, the "**Interests**").

B.      In order to induce Holder to enter into the Purchase Agreement, the Company
        has agreed to grant Holder the option to cause the Interests owned by Holder
        to be repurchased by the Company under certain terms and conditions.

C.      This Agreement sets forth the terms and conditions under which the option
        may be exercised. Capitalized terms used herein and not defined herein shall
        have the meanings ascribed to them in the Purchase Agreement.

NOW THEREFORE, in consideration of the mutual agreements, covenants and
provisions herein contained, the parties agree as follows:

### ARTICLE 1    OPTION TO PUT THE COMPANY INTERESTS

1.01    GRANT OF OPTION. The Company hereby grants Holder the option to
require the Company, subject to the terms and conditions set forth herein, to repurchase all,
but not less than all, of the Interests (the "**Put Option**").

1.02    TIME OF EXERCISE. Holder may exercise the Put Option only during the
Put Period. The "**Put Period**" shall be the sixty (60) day period which shall begin the day
after the earliest to occur of the following events: (a) December 9, 2011; (b) such earlier

1389647.8

date as all amounts outstanding pursuant to the Seller Note become due and payable, including the Maturity Date (as defined therein) or as a result of any acceleration of payment under the Seller Note (but not including the voluntary prepayment thereof); or (c) a Sale Event (as defined below); provided, however, if the Holder has attempted to exercise the Put Option and the Company delivers to the Holder a Notice of Put Restriction pursuant to Section 1.03(a), and Holder rescinds such exercise in a timely manner by delivering a Notice of Rescission pursuant to Section 1.03(b), then the Put Period shall be the sixty (60) day period beginning the day after the Company delivers to the Holder a Notice of Permitted Put Exercise pursuant to Section 1.03(b). (The events listed in items (a) and (b) of this Section 1.02 are referred to herein as **"Note Events"**.) The Company shall promptly advise Holder of the execution of any agreement, document or instrument providing for a Sale Event and of the occurrence of any Sale Event.

a) For purposes of this Section 1.02, **"Sale Event"** shall mean (i) a sale of substantially of the Company's assets to an Unrelated Third Party, or (ii) the merger of the Company with or into another corporation or other entity in which the owners of more than 50% of the actually issued and outstanding voting interests in the Company as of the date hereof (or their Affiliates) do not own more than 50% of the voting power of the issued and outstanding equity securities of the surviving corporation or other entity immediately after such merger; or (iii) the transfer or sale to an Unrelated Third Party of issued and outstanding equity interests representing more than 50% of the voting power in the Company.

b) For purposes of determining whether a Sale Event has occurred, a party shall be an **"Unrelated Third Party"** unless (a) such party is a member of the Company as of the date hereof or an Affiliate of any such member, or (b) the Company owns more than 50% of the outstanding voting securities of such party.

c) An **"Affiliate"** shall mean, with respect to any party, any party which controls, is controlled by or under common control with, such party.

1.03    MANNER OF EXERCISE. Holder may exercise the Put Option in accordance with Section 1.02 above by delivering to the Company during the Put Period a written notice notifying the Company that Holder is exercising the Put Option pursuant to this Agreement as specified in such notice (the **"Exercise Notice"**).

a) Except as provided in Section 1.03(b) below, the exercise of the Put Option by the Holder shall be irrevocable and shall be deemed to occur on the date on which the Exercise Notice is delivered to the Company. If the Company determines, after the receipt of the Exercise Notice and prior to the closing of the purchase of the Interests pursuant to Section 2.01, that the Company is subject to a Put Restriction (as defined in Section 2.03), the Company shall promptly provide the Holder with a notice (**"Notice of Put Restriction"**) which shall include a general description of the applicable restrictions on the purchase of the Interests. Within the twenty (20) day period following delivery of the Notice of Put Restriction, the Holder may elect to rescind the Exercise Notice by providing written notice of such rescission to the Company (**"Notice of Rescission"**).

b)    If the Holder fails to provide a timely Notice of Rescission, then the exercise of the Put Option shall be irrevocable and shall be deemed to occur on the date on which the Exercise Notice is delivered to the Company. If the Holder provides a timely Notice of Rescission, then the exercise of the Put Option shall be deemed to have been rescinded and such exercise shall be of no force and effect. If, at any time after timely receipt of the Notice of Rescission, the Company determines that there are no Put Restrictions, then the Company shall promptly thereafter deliver to the Holder a notice ("**Notice of Permitted Put Exercise**") informing the Holder that the purchase of the Interests is no longer prohibited, and that the Put Period has recommenced. In that situation, Holder shall be permitted to exercise the Put Option, and the Put Period shall be the sixty (60) day period beginning the day after the Company delivers to the Holder the Notice of Permitted Put Exercise.

c)    If the Company has provided a Notice of Put Restriction, and the Holder fails to deliver to the Company a timely Notice of Rescission, then the Holder shall be deemed to have irrevocably exercised the Put Option, and the provisions of Section 1.06 and 2.03 shall apply.

d)    If the Holder fails to exercise the Put Option during the Put Period, the Put Option shall expire.

1.04    PURCHASE PRICE. The purchase price to be paid by the Company at the closing of the purchase and sale of the Interests pursuant to the exercise of the Put Option (the "**Purchase Price**") shall be: (A) (i) if the Put Option is exercised with respect to a Sale Event, an aggregate price equal to the Sale Event Purchase Price (as defined in Section 1.05 below); or (ii) in all other circumstances, an aggregate price equal to the Note Event Purchase Price (as defined in Section 1.05 below), minus (B) an amount equal to the total distributions made by the Company to the Holder pursuant to clause (ii) of Section 1.06 below. The procedure for determining the Sale Event Purchase Price and the Note Event Purchase Price is set forth in Section 1.05 below.

1.05    DETERMINATION OF PURCHASE PRICE. Promptly following delivery of the Exercise Notice, the Company and Holder shall determine the applicable Purchase Price in accordance with the following:

a)    The "**Sale Event Purchase Price**" shall be equal to the total amount that the holder of the Interests would receive if all of the assets and liabilities of the Company were sold for cash at their Fair Market Value as of the date of the exercise of the Put Option, and all of the cash remaining after satisfying or reserving for all liabilities were distributed to the Company's members pursuant to the terms of the Company's limited liability company operating agreement, of even date herewith, as amended ("**Operating Agreement**").

b)    The "**Note Event Purchase Price**" shall be the product of (i) the total amount that the holder of the Interests would receive if all of the assets and liabilities of the Company were sold for cash at their Fair Market Value as of the date of exercise of the Put Option, and all of the cash remaining after satisfying or reserving for all liabilities were distributed to the Company's members pursuant to the terms of

the Operating Agreement, multiplied by (ii) the Discount Percentage (as defined and determined below.

c)    The **"Fair Market Value"** for the purposes hereof shall be the net fair market value of all of the Company's assets and business (including goodwill), net of the fair market value of all liabilities (including without limitation, fixed and contingent liabilities) (in each case, determined on a consolidated basis) (without accounting for a control interest or any marketability discount) which shall be determined in accordance with this Section by an independent appraiser jointly designated by the Company and Holder or, in the event the parties are unable to jointly agree on the designation of one appraiser, as follows: one appraiser designated by the Company and one appraiser designated by Holder shall together appoint a third appraiser, and the latter shall determine the Fair Market Value. Each party will pay one-half of the appraisers' fees. In the case of a Sale Event, the Fair Market Value shall be based on the price or value of the Company obtained in or as determined by such Sale Event.

d)    The **"Discount Percentage"** shall be determined by the above-designated appraiser, which will provide for a fair market discount on the Interests to account for a minority interest and marketability discount of at least 10%, but no more than 30%.

1.06    IMPACT OF EXERCISE. Upon the delivery of the Exercise Notice to the Company (and irrespective of the timing of the Put Closing), Holder's rights as a member of the Company shall cease immediately (including any rights to profit allocations and distributions, and any allocations of items of taxable income or loss attributable to activities and operations of the Company for the period beginning after the date of the Exercise Notice) and the only amounts that Holder shall be entitled to receive in respect of the Interests are (i) the payments provided for in Article 2 hereof, and (ii)  Holder's pro rata share of any tax distributions made pursuant to Section 6.9.2 of the Company's amended and restated Limited Liability Company Operating Agreement that are paid after the delivery of the Exercise Notice and prior to the Put Closing; provided, however, the amount paid pursuant to clause (ii) of this Section 1.06 shall not exceed the amount payable under clause (A) of Section 1.04; provided, further, if the Company has provided a Notice of Put Restriction and Holder rescinds its exercise of the Put Option in a timely fashion pursuant to Section 1.03(b) hereof, all of Holder's prior rights as a member shall be reinstated.

ARTICLE 2    CLOSING OF PURCHASE

2.01    CLOSING. The closing of the purchase by the Company of the Interests pursuant to the exercise of the Put Option (the **"Put Closing"**) shall be held at 10 a.m., local time, at the offices of Irell & Manella LLP, located at 1800 Avenue of the Stars, Suite 900, Los Angeles, California 90067, on a date agreed to by the Company and Holder, but, not later than the later of (a) thirty (30) days after the date of the Exercise Notice, (b) ten (10) days after the determination of the Fair Market Value pursuant to Section 1.05 above or (c) if a Put Restriction is in effect, then the date upon which no Put Restriction is in effect.

2.02    CLOSING DELIVERIES.  At the Put Closing:

a)    Holder will deliver to the Company any certificate(s) representing the Interests, duly endorsed for transfer or accompanied by stock or Unit powers or other documents or instruments of assignment as reasonably requested by the Company.

b)    Holder will represent and warrant to the Company that the Interests are free and clear of all liens, encumbrances, charges and other claims.

c)    The Company will deliver to Holder a certificate of its Chief Financial Officer certifying to Holder that immediately following the Put Closing and the payment of the Purchase Price, the Company will not be insolvent and its assets will exceed its liabilities.

d)    The Company will deliver the Purchase Price to the Company by wire transfer of immediately available funds to an account designated by Holder at least five (5) days prior the Put Closing.

e)    The President or Chief Executive Officer of the Company will deliver a written statement that (A) the Company is purchasing the Interests for investment and not with a view toward distribution or sale, (B) the Company is aware that the Interests have not been registered under federal or state securities laws, and will constitute "restricted stock" as that term is defined under Rule 144 promulgated under the Securities Act of 1933, and (C) the Company is aware that any restricted stock may not be sold, transferred or otherwise disposed of by the Company without registration unless, in the opinion of counsel, such registration is not required under the Securities Act of 1933 or applicable state securities laws.

2.03    IMPACT OF LEGAL OR CONTRACTUAL RESTRICTIONS ON PAYMENT.  The Put Closing shall not occur if the consummation of the Put Closing would (i) contravene, breach or cause a default under any contract or agreement to which the Company or MDC Subsidiary is bound, or (ii) violate any applicable laws, regulations or orders (any such condition in (i) or (ii), a "**Put Restriction**").  If, in the event of a Put Restriction, the Holder exercises its right of rescission in a timely fashion pursuant to Section 1.03(b), then the exercise of the Put Option shall be rescinded.  If the Holder has not exercised its right of rescission in a timely fashion, then the Put Closing shall be deferred until such time as no Put Restriction shall exist, at which time the Put Closing shall occur, and Holder shall be paid the purchase price to which he is entitled (without increase or interest) pursuant to Section 1.05.

ARTICLE 3    COVENANTS

The Company covenants that:

3.01    FINANCIAL STATEMENTS.  The Company shall deliver to Holder as soon as issued and available and in any event within one hundred eighty (180) calendar days after the close of each fiscal year of the Company commencing with the fiscal year ending December 31, 2005, its consolidated annual financial statements, in reasonable detail.  The Company shall further deliver to Holder as soon as practicable and in any event within forty-

five (45) calendar days after the close of each fiscal quarter of the Company commencing with the first fiscal quarter ending after the date of this Agreement, unaudited financial statements in reasonable detail. Holder shall keep such financial information in confidence consistent with his obligations as a member of the Company. The Company's obligations to provide financial statements hereunder shall terminate upon the earlier of (a) exercise of the Put Option or (b) expiration of the period for exercising the Put Option specified in Section 1.02 above.

ARTICLE 4   MISCELLANEOUS

     4.01    REMEDIES. All disputes, claims, or controversies arising out of or relating to this Agreement, the negotiation, validity or performance hereof or the transactions contemplated hereby that are not resolved by mutual agreement shall be resolved solely and exclusively by binding arbitration in accordance with Section 15.11 of the Purchase Agreement.

     4.02    AMENDMENTS AND WAIVERS. Except as otherwise provided herein, the provisions of this Agreement may be amended or waived only upon the prior written consent of the Company and Holder.

     4.03    SUCCESSORS AND ASSIGNS. All covenants and agreements in this Agreement by or on behalf of any of the parties hereto will bind and inure to the benefit of the respective successors and permitted assigns. Holder shall be permitted to assign its rights hereunder to Michael Del Castello.

     4.04    SEVERABILITY. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement is held to be prohibited by or invalid under applicable law, such provision will be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of this Agreement.

     4.05    COUNTERPARTS. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

     4.06    DESCRIPTIVE HEADINGS. The captions and descriptive headings of this Agreement are inserted for convenience only and do not constitute a part of this Agreement.

     4.07    GOVERNING LAW. All other questions concerning the construction, validity and interpretation of this Agreement will be governed by the laws of Delaware without regard to choice of law principles which would require the application of the laws of any other jurisdiction.

     4.08    ENTIRE AGREEMENT. This Agreement, together with the Purchase Agreement and the Schedules and Exhibits thereto, and the other Ancillary Documents, constitutes the entire agreement between the parties hereto and supersedes all prior agreements, representations, warranties, statements, promises, information, arrangements and understandings, whether oral or written, express or implied, with respect to the subject matter hereof.

4.09    NOTICES.  All notices and other communications given or made pursuant hereto shall be in writing and shall be deemed to have been duly given or made as of the date delivered or mailed if delivered personally or mailed by registered or certified mail (postage prepaid, return receipt requested), or sent by facsimile transmission (confirmation received), to the parties at the following addresses and facsimile transmission numbers (or at such other address or number for a party as shall be specified by like notice), except that notices of changes of address or number shall be effective only upon receipt:

(a)    if to Holder:

Del Castello Gallery, Inc.
c/o Michael Del Castello
5401 S.E. Scenic Lane
Unit 104
Vancouver, WA 98661
Telecopy No.: (360) 609-7545

with a copy to:

MBV Law LLP
855 Front Street
San Francisco, CA 94111
Attention: William Mandel, Esq.
Telecopy No.: (415) 433-6563

(b)    if to the Company:

MDC Holding Investments, LLC
23842 Cabot Blvd.
Hayward, CA 94545
Attention: Kevin Cullen
Telecopy No.: (510) 265-3615

with a copy to:

Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA  90067
Attention: Mitchell Cohen
Telecopy No.: (310) 203-7199

4.10    SUBORDINATION AGREEMENTS.  This Agreement, and all amounts payable hereunder, shall be subject to customary forms of subordination agreements requested from time to time by holders of Senior Indebtedness and, upon the request of the Company from time to time, the Holder agrees to execute and deliver to the Company such forms of subordination agreements in favor of the holders of Senior Indebtedness.  "**Senior Indebtedness**" means any and all principal of, premium, if any, and interest on indebtedness of the Company or any subsidiary pursuant to the Credit and Guaranty Agreement, dated as of December 9, 2005, among MDC Subsidiary, the Company and D.B. Zwirn Special

Opportunities Fund, L.P., and the Credit Documents (as defined therein), and any amendments, supplements, restatements, replacements, renewals, refinancings, waivers or modifications thereof.

*[signature page follows]*

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the day and year first above written.

**MDC HOLDING INVESTMENTS, LLC**

By: _____
Name: JOSEPH BROWNELL
Title: PRESIDENT AND CEO


**DEL CASTELLO GALLERY, INC.**
**(F/K/A MDC VACUUM PRODUCTS CORPORATION)**

By: _____
Name: MICHAEL DEL CASTELLO
Title: CHAIRMAN OF THE BOARD

EXHIBIT TWO

EXECUTION COPY

CONSULTING FEE SUBORDINATION AGREEMENT

dated as of December 9, 2005

among

MICHAEL DEL CASTELLO
as Consultant

MDC HOLDING INVESTMENTS, LLC,
as Holdings

and

D.B. ZWIRN SPECIAL OPPORTUNITIES FUND L.P.,
in its separate capacities as Asset Based Collateral Agent, Tranche A Collateral Agent
and Tranche B Collateral Agent

NY\1087263.5

# TABLE OF CONTENTS

PAGE

ARTICLE I DEFINITIONS .................................................................................................... 1

    Section 1.01    General Definitions ................................................................................. 1
    Section 1.02    Definitions; Interpretation ...................................................................... 3

ARTICLE II SUBORDINATION ........................................................................................... 3

    Section 2.01    Agreement to Subordinate ..................................................................... 3
    Section 2.02    In Furtherance of Subordination ........................................................... 4
    Section 2.03    No Enforcement or Commencement of Any Proceedings ..................... 5
    Section 2.04    Rights of Subrogation ........................................................................... 6
    Section 2.05    Subordination Legend; Further Assurances ........................................... 6
    Section 2.06    No Change in or Disposition of Subordinated Fees ............................... 6
    Section 2.07    Agreement by Holdings ......................................................................... 6
    Section 2.08    Obligations Hereunder Not Affected ..................................................... 6

ARTICLE III MISCELLANEOUS. ......................................................................................... 7

    Section 3.01    Notices .................................................................................................. 7
    Section 3.02    Miscellaneous ....................................................................................... 9
    Section 3.03    APPLICABLE LAW ........................................................................... 10
    Section 3.04    CONSENT TO JURISDICTION ....................................................... 10
    Section 3.05    WAIVER OF JURY TRIAL ............................................................... 10

EXHIBIT A — CONSULTING AGREEMENT

This CONSULTING FEE SUBORDINATION AGREEMENT, dated as of December 9, 2005 (this "Agreement"), among MICHAEL DEL CASTELLO, an individual (the "Consultant"), MDC HOLDING INVESTMENTS, LLC, a Delaware limited liability company ("Holdings") and D.B. ZWIRN SPECIAL OPPORTUNITIES FUND L.P., in its separate capacities as Asset Based Collateral Agent for the Asset Based Secured Parties (as herein defined) (in such capacity, the "Asset Based Collateral Agent"), as Tranche A Collateral Agent for the Tranche A Secured Parties (as herein defined) (in such capacity, the "Tranche A Collateral Agent") and as Tranche B Collateral Agent for the Tranche B Secured Parties (in such capacity, the "Tranche B Collateral Agent" and, together with the Asset Based Collateral Agent and the Tranche B Collateral Agent, the "Collateral Agents").

RECITALS:

WHEREAS, reference is made to that certain Credit and Guaranty Agreement, dated as of the date hereof (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), by and among Holdings, MDC VACUUM PRODUCTS, LLC, a Delaware limited liability company (the "Borrower"), the Lenders party thereto from time to time (the "Lenders"), and D.B. ZWIRN SPECIAL OPPORTUNITIES FUND, L.P., as Administrative Agent (the "Administrative Agent") and in its separate capacities as Asset Based Collateral Agent, Tranche A Collateral Agent and Tranche B Collateral Agent;

WHEREAS, pursuant to that certain Consulting Agreement, dated as of the date hereof, in substantially the form attached hereto as Exhibit A (as it may be amended, restated, supplemented or otherwise modified from time to time, the "Consulting Agreement") by and among Holdings and Consultant, Consultant has agreed to provide the Services (as defined in the Consulting Agreement) upon the terms and subject to the conditions set forth therein;

NOW, THEREFORE, in consideration of the premises and the agreements, provisions and covenants herein contained, Consultant, Holdings and the Collateral Agent agree as follows:

ARTICLE I

DEFINITIONS

Section 1.01        General Definitions.  In this Agreement, the following terms shall have the following meanings:

"Agreement" shall have the meaning set forth in the preamble.

"Asset Based Collateral Agent" shall have the meaning set forth in the preamble.

"Asset Based Secured Parties" means the Lenders of Asset Based Loans and shall include, without limitation, all former Lenders of Asset Based Loans to the extent that any Senior Debt owing to such Persons was incurred while such Persons were Lenders of Asset Based Loans and such Senior Debt has not been paid or satisfied in full.

"Borrower" shall have the meaning set forth in the preamble.

"Consulting Agreement" shall have the meaning set forth in the recitals.

1

"Credit Agreement" shall have the meaning set forth in the recitals.

"Credit Documents" shall have the meaning specified in the Credit Agreement.

"Event of Default" means each of the conditions or events set forth in Section 8.01 of the Credit Agreement.

"Holdings" shall have the meaning set forth in the recitals.

"Lien" shall mean any lien, mortgage, pledge, assignment, security interest, charge or encumbrance of any kind (including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, and any lease in the nature thereof) and any option, trust or other preferential arrangement having the practical effect of any of the foregoing.

"Proceeds" shall mean: (i) all "proceeds" as defined in Article 9 of the UCC and (ii) whatever is receivable or received when Collateral or proceeds are sold, exchanged, collected or otherwise disposed of, whether such disposition is voluntary or involuntary.

"Record" shall have the meaning specified in Article 9 of the UCC.

"Secured Parties" shall mean the Asset Based Secured Parties, the Tranche A Secured Parties and the Tranche B Secured Parties and "Secured Party" shall mean any of them.

"Senior Debt" shall mean all obligations, liabilities and indebtedness of every nature of Holdings from time to time owed to the Administrative Agent, the Collateral Agents or any Secured Party under the Loan Documents, including, without limitation, the principal amount of all debts, claims and indebtedness, accrued and unpaid interest and all fees, costs and expenses, whether primary, secondary, direct, contingent, fixed or otherwise, heretofore, now and from time to time hereafter owing, due or payable, whether before or after the filing of a petition initiating any proceeding referred to in Section 2.02(a), together with (a) any amendments, modifications, renewals, extensions or refinancings thereof or of indebtedness or other obligations such Senior Debt supports and (b) any interest accruing after the filing of a petition initiating any proceeding referred to in Section 2.02(a), whether or not allowed as a claim in such proceeding. Senior Debt shall be considered to be outstanding whenever any loan or loan commitment under the Credit Agreement is outstanding.

"Subordinated Fees" shall mean any and all future fees, expenses and other amounts payable to Consultant under the Consulting Agreement in respect of the provisions of Services (as defined in the Consulting Agreement) and all rights and remedies of Consultant with respect thereto, but shall not include COBRA payments to the extent paid or payable pursuant to and in accordance with Section 3(b) of the Consulting Agreement.

"Tranche A Collateral Agent" shall have the meaning set forth in the preamble.

"Tranche A Secured Parties" means the Lenders of Tranche A Term Loans and shall include, without limitation, all former Lenders of Tranche A Term Loans to the extent that any Senior Debt owing to such Persons was incurred while such Persons were Lenders of Tranche A Term Loans and such Senior Debt has not been paid or satisfied in full.

"Tranche B Collateral Agent" shall have the meaning set forth in the preamble.

2

NY\1087263.5

"Tranche B Secured Parties" means the Lenders of Tranche B Term Loans and shall include, without limitation, all former Lenders of Tranche B Term Loans to the extent that any Senior Debt owing to such Persons was incurred while such Persons were Lenders of Tranche B Term Loans and such Senior Debt has not been paid or satisfied in full.

"UCC" shall mean the Uniform Commercial Code as in effect from time to time in the State of New York or, when the context implies, the Uniform Commercial Code as in effect from time to time in any other applicable jurisdiction.

"United States" shall mean the United States of America.

Section 1.02    Definitions; Interpretation. All capitalized terms used herein (including the preamble and recitals hereto) and not otherwise defined herein shall have the meanings ascribed thereto in the Credit Agreement or, if not defined therein, in the UCC. References to "Sections," "Exhibits" and "Schedules" shall be to Sections, Exhibits and Schedules, as the case may be, of this Agreement unless otherwise specifically provided. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect. Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. The use herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not nonlimiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. If any conflict or inconsistency exists between this Agreement and the Credit Agreement, the Credit Agreement shall govern. All references herein to provisions of the UCC shall include all successor provisions under any subsequent version or amendment to any Article of the UCC.

ARTICLE II

SUBORDINATION

Section 2.01    Agreement to Subordinate.

(a)    Each of Holdings and Consultant agrees that the Subordinated Fees are and shall be "subordinate and rendered junior in right of payment" to the prior indefeasible payment in full in cash of all Senior Debt to the extent and in the manner set forth herein. For purposes of this Agreement, "subordinate and rendered junior in right of payment" means that no part of the Subordinated Fees shall have any claim to the assets of Holdings on a parity with or prior to the claim of the Senior Debt. Moreover, the Senior Debt shall not be deemed to have been paid in full in cash until the Secured Parties shall have received full payment in respect of the Senior Debt in cash, which payment shall have been retained by the Secured Parties for a period of time in excess of all applicable preference or other similar periods under applicable bankruptcy, insolvency or creditors' rights laws. Each of Holdings and Subordinated Creditor waives notice of acceptance of this Agreement by the Secured Parties, and Subordinated Creditor waives notice of and consent to the making, amount and terms of the Senior Debt that may exist or be created from time to time and any renewal, extension, amendment, modification or refinancing thereof or of indebtedness or other obligations such Senior Debt supports, and any

NY\1087263.5

other lawful action that any Secured Party, in its sole and absolute discretion, may take or omit to take with respect thereto. The provisions of this Section 2.01(a) shall constitute a continuing offer made for the benefit of and to Collateral Agent and all Secured Parties.

(b)    In the event that Holdings shall make, and/or Subordinated Creditor shall receive, any payment of Subordinated Fees in contravention of this Agreement, then and in any such event such payment shall be deemed to be the property of, segregated, received and held in trust for the benefit of and shall be promptly paid over and delivered to the Collateral Agents for the pro rata benefit of the Secured Parties; provided however that any such payment made by Holdings in good faith without actual or constructive knowledge that it contravenes the provisions of this Agreement shall not constitute an Event of Default under the Credit Documents if such payment is segregated, received, held and paid over to the Collateral Agents in compliance with this Section 2.01(b) and Section 2.02(c).

(c)    Holdings shall not make, and Subordinated Creditor shall not receive or accept, any payment in respect of any Subordinated Fees if any Event of Default under the Credit Agreement has occurred and is continuing or would result therefrom, unless and until (i) the Senior Debt has been paid in full in cash, (ii) such Event of Default has been cured or waived in accordance with the Credit Agreement, or (iii) Collateral Agents have otherwise consented in writing.

Section 2.02    In Furtherance of Subordination.

(a)    Upon any distribution of all or any of Holdings' assets in the event of:

(i)    any insolvency or bankruptcy case or proceeding, or any receivership, liquidation, reorganization or other similar case or proceeding in connection therewith, relative to Holdings, or to its creditors, as such, or to its assets,

(ii)    any liquidation, dissolution or other winding up of Holdings, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy, or

(iii)    any assignment for the benefit of creditors or any other marshalling of assets and liabilities of Holdings,

then, and in any such event, unless the Collateral Agents shall otherwise agree in writing, the Secured Parties shall receive payment in full in cash of all amounts due or to become due (whether or not any Senior Debt has been declared due and payable prior to the date on which such Senior Debt would otherwise have become due and payable) on or in respect of all Senior Debt (including post-petition interest), and before Consultant or anyone claiming through or on his behalf (including any receiver, trustee, or otherwise) are entitled to receive any payment on account of principal of (or premium, if any) or interest on or other amounts payable in respect of the Subordinated Fees, and to that end, any payment or distribution of any kind or character, whether in cash, property or securities, which may be payable or deliverable in respect of the Subordinated Fees in any such case, proceeding, dissolution, liquidation or other winding up or event, shall be paid or delivered directly to the Collateral Agents for the application (in the case of cash) to, or as collateral (in the case of non-cash property or securities) for, the payment or prepayment of the Senior Debt on a pro rata basis to the Secured Parties until the Senior Debt shall have been indefeasibly paid in full in cash.

4

NY: 1087263.5

(b)    If any proceedings, liquidation, dissolution or winding up referred to in clause (a) above is commenced by or against Holdings,

(i)    Each Collateral Agent is hereby irrevocably authorized and empowered (in its own name or in the name of Holdings, Consultant or otherwise), but shall have no obligation, to demand, sue for, collect and receive every payment or distribution in respect of the Subordinated Fees above and give acquittance therefor and to file claims and proofs of claim and take such other action (including voting the Subordinated Fees) as the Collateral Agent may reasonably deem necessary or advisable for the exercise or enforcement of any of the rights or interests of the Collateral Agent hereunder; provided that, in the event the Collateral Agent takes such action, the Collateral Agent shall apply all proceeds first to the payment of the costs of enforcement of this Agreement, and second to the pro rata payment of the Senior Debt; and

(ii)    Consultant shall duly and promptly take such action as Collateral Agents may reasonably request (A) to collect the Subordinated Fees for the account of Collateral Agents and to file appropriate claims or proofs of claim in respect of the Subordinated Fees, (B) to execute and deliver to Collateral Agents such powers of attorney, assignments, or other instruments as Collateral Agents may reasonably request to enable them to enforce any and all claims with respect to the Subordinated Fees, and (C) to collect and receive any and all payments or distributions that may be payable or deliverable on or with respect to the Subordinated Fees.

(c)    All payments or distributions of assets of Holdings, whether in cash, property or securities on or with respect to the Subordinated Fees that are received by Consultant contrary to the provisions of this Agreement shall be deemed to be the property of, segregated, received and held in trust for the benefit of and shall be promptly paid over and delivered, in the same form as so received (with any necessary endorsement), to the Collateral Agents for the pro rata benefit of the Secured Parties, and, after being paid over and delivered, in the same form as so received (with any necessary endorsement), to the Collateral Agents such amounts shall be deemed not to have been paid to Subordinated Creditor.

(d)    Subordinated Creditor shall not initiate, prosecute or participate in any claim, action or other proceeding challenging the enforceability, validity, perfection or priority of the Senior Debt or any liens or security interests securing the Senior Debt.

(e)    Each Collateral Agent is hereby authorized to demand specific performance of this Agreement, whether Holdings or Consultant shall have complied with any of the provisions hereof applicable to it, at any time when Consultant or any one of them shall have failed to comply with any of the provisions of this Agreement applicable to it. Consultant hereby irrevocably waives any defense (other than the defense of payment in full of the Senior Debt) based on the adequacy of a remedy at law which might be asserted as a bar to such remedy of specific performance.

Section 2.03    No Enforcement or Commencement of Any Proceedings. Consultant agrees that, until the Senior Debt is indefeasibly paid in full in cash and all commitments to lend under the Credit Documents are terminated, it will not accelerate the maturity of the Subordinated Fees, sue to enforce any right with respect thereto or commence, or

NY:1087263.5

join with any creditor other than the Secured Parties in commencing, any proceeding referred to in Section 2.02(a).

Section 2.04    Rights of Subrogation.  Consultant agrees that no payment or distribution to any Collateral Agent or Secured Parties pursuant to the provisions of this Agreement shall entitle Consultant to exercise any rights of subrogation in respect thereof until all Senior Debt has been paid in full in cash.  Consultant agrees that the subordination provisions contained herein shall not be affected by any action, or failure to act, by any Collateral Agent or any Secured Party that results, or may result, in affecting, impairing or extinguishing any right of reimbursement or subrogation or other right or remedy of Consultant against Holdings.

Section 2.05    Subordination Legend; Further Assurances.  Consultant and Holdings will cause the Consulting Agreement to be endorsed with a legend substantially as follows:

"PAYMENTS OF ANY AND ALL FEES, EXPENSES AND ANY OTHER AMOUNTS HEREUNDER ARE EXPRESSLY SUBORDINATED AND SUBJECT IN RIGHT OF PAYMENT TO THE PRIOR PAYMENT IN FULL OF CERTAIN SENIOR DEBT PURSUANT TO, AND TO THE EXTENT PROVIDED IN, THE CONSULTING FEE SUBORDINATION AGREEMENT DATED AS OF DECEMBER 9, 2005, AMONG HOLDINGS, CONSULTANT AND D.B. ZWIRN SPECIAL OPPORTUNITIES FUND L.P."

Each of Holdings and Consultant will at its own expense and at any time and from time to time promptly execute and deliver all further instruments and documents and take all further action that may be necessary or that the Collateral Agents may reasonably request to protect any right or interest granted or purported to be granted hereunder or to enable the Collateral Agents to exercise and enforce their respective rights and remedies hereunder.

Section 2.06    No Change in or Disposition of Subordinated Fees.  Consultant will not, without the prior written consent of the Collateral Agents:

(a)    sell, assign, transfer, endorse, pledge, encumber or otherwise dispose of any of the Subordinated Fees (except under this Agreement); or

(b)    permit the terms of any of the Subordinated Fees to be changed in such a manner as to have a material adverse effect on the rights or interests of the Secured Parties or the Collateral Agents.

Section 2.07    Agreement by Holdings.  Holdings agrees that it will not make any payment on any of the Subordinated Fees, or take any other action, in contravention of the provisions of this Agreement.

Section 2.08    Obligations Hereunder Not Affected.  All rights and interest of any of the Collateral Agents and Secured Parties hereunder, and all agreements and obligations of Holdings and Consultant hereunder, shall remain in full force and effect irrespective of:

(a)    any lack of validity or enforceability of any document evidencing Senior Debt;

(b)    any change in the time, manner or place of payment of, or any other term of, all or any of the Senior Debt, or any other amendment or waiver of or any consent to departure from any of the documents evidencing or relating to the Senior Debt;

6

(c)    any exchange, release or nonperfection of the Collateral, or any release or amendment or waiver of or consent to departure from any Credit Document, for all or any of the Senior Debt;

(d)    any failure of a Collateral Agent or any Secured Party to assert any claim or to enforce any right to remedy against any other party hereto under the provisions of this Agreement, the Credit Agreement, or any other Credit Document other than this Agreement;

(e)    any reduction, limitation, impairment or termination of the Senior Debt for any reason (other than the defense of payment in full of the Senior Debt), including any claim of waiver, release, surrender, alteration or compromise, and such rights and interest of any Collateral Agent or any Secured Party, and such agreements and obligations of Holdings and Consultant, shall not be subject to (and each of Holdings and Consultant hereby waive any right to or claim of) any defense (other than the defense of payment in full of the Senior Debt) or set-off, counterclaim, recoupment or termination whatsoever by reason of invalidity, illegality, nongenuineness, irregularity, compromise, unenforceability of, or any other event or occurrence affecting, any Senior Debt; and

(f)    any other circumstance which might otherwise constitute a defense (other than the defense of payment in full of the Senior Debt) available to, or a discharge of, Holdings in respect of the Senior Debt or Consultant in respect of this Agreement.

This Agreement shall continue to be effective or be reinstated, as the case may be, if at any time any payment of any of the Senior Debt is rescinded or must otherwise be returned by any Collateral Agent or any Secured Party upon the insolvency, bankruptcy or reorganization of Holdings or Consultant or otherwise, all as though such payment had not been made. Consultant acknowledges and agrees that the Collateral Agents may, in accordance with the terms of the Credit Documents, without notice or demand and without affecting or impairing Consultant's obligations hereunder, from time to time (i) renew, compromise, extend, increase, accelerate or otherwise change the time for payment of, or otherwise change the terms of the Senior Debt, to the extent applicable, or any part thereof, including, without limitation, increase or decrease the rate of interest thereon or the principal amount thereof; (ii) take or hold security or guaranties for the payment of the Senior Debt and exchange, enforce, foreclose upon, waive and release any such security or guaranty; (iii) apply such security and direct the order or manner of sale thereof as the Collateral Agents, in their sole discretion, may determine; (iv) release and substitute one or more endorsers, warrantors, the Credit Parties (as defined in the Credit Agreement) or other obligors; and (v) exercise or refrain from exercising any rights against the Credit Parties or any other person.

ARTICLE III

MISCELLANEOUS.

Section 3.01    Notices.  Any notice required or permitted to be given under this Agreement shall be given as follows:

(a)    if to Consultant, to:

Michael Del Castello
5401 S.E. Scenic Lane

7

Unit 104
Vancouver, WA 98661
Telecopy No.: (360) 609-7545

(b)     if to Holdings, to:

MDC Holding Investments, LLC
23842 Cabot Blvd.
Hayward, CA 94545
Attention: Kevin Cullen
Telecopy No.: (510) 265-3615

with a copy, which shall not constitute notice, to:

Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Attention: Mitchell Cohen, Esq.
Telecopy No.: (310) 203-7199

(c)     if to the Asset Based Collateral Agent, to:

D.B. Zwirn Special Opportunities Fund, L.P.
745 Fifth Avenue, 18th Floor
New York, New York 10151
Attn: Quinn Morgan
Telecopy: (646) 720-9086
and
Attn: Li Ann Law
Telecopy No.: (646) 720-9055

with a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022-4834
Attn: Marc P. Hanrahan, Esq.
Telecopy No.: (212) 751-4864

(d)     if to the Tranche A Collateral Agent, to:

D.B. Zwirn Special Opportunities Fund, L.P.
745 Fifth Avenue, 18th Floor
New York, New York 10151
Attn: Quinn Morgan
Telecopy: (646) 720-9086
and
Attn: Li Ann Law

8

Telecopy No.: (646) 720-9055

with a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022-4834
Attn: Marc P. Hanrahan, Esq.
Telecopy No.: (212) 751-4864


(e)    if to the Tranche B Collateral Agent, to:

D.B. Zwirn Special Opportunities Fund, L.P.
745 Fifth Avenue, 18th Floor
New York, New York 10151
Attn: Quinn Morgan
Telecopy: (646) 720-9086
and
Attn: Li Ann Law
Telecopy No.: (646) 720-9055

with a copy to:

Latham & Watkins LLP
885 Third Avenue
New York, New York 10022-4834
Attn: Marc P. Hanrahan, Esq.
Telecopy No.: (212) 751-4864


Section 3.02    Miscellaneous.  No failure or delay on the part of any
Collateral Agent in the exercise of any power, right or privilege hereunder or under any other
Credit Document shall impair such power, right or privilege or be construed to be a waiver of any
default or acquiescence therein, nor shall any single or partial exercise of any such power, right or
privilege preclude other or further exercise thereof or of any other power, right or privilege.  All
rights and remedies existing under this Agreement and the other Credit Documents are
cumulative to, and not exclusive of, any rights or remedies otherwise available.  In case any
provision in or obligation under this Agreement shall be invalid, illegal or unenforceable in any
jurisdiction, the validity, legality and enforceability of the remaining provisions or obligations, or
of such provision or obligation in any other jurisdiction, shall not in any way be affected or
impaired thereby.  All covenants hereunder shall be given independent effect so that if a
particular action or condition is not permitted by any of such covenants, the fact that it would be
permitted by an exception to, or would otherwise be within the limitations of, another covenant
shall not avoid the occurrence of a Default or an Event of Default if such action is taken or
condition exists.  This Agreement shall be binding upon and inure to the benefit of the Collateral
Agents and Consultants and their respective successors and assigns.  No Consultant shall, without
the prior written consent of the Collateral Agents given in accordance with the Credit Agreement,
assign any right, duty or obligation hereunder.  This Agreement and the other Credit Documents
embody the entire agreement and understanding between Consultants and the Collateral Agents
and supersede all prior agreements and understandings between such parties relating to the

9

subject matter hereof and thereof. Accordingly, the Credit Documents may not be contradicted by evidence of prior, contemporaneous or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties. This Agreement may be executed in one or more counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed an original, but all such counterparts together shall constitute but one and the same instrument; signature pages may be detached from multiple separate counterparts and attached to a single counterpart so that all signature pages are physically attached to the same document.

Section 3.03    APPLICABLE LAW. THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK WITHOUT REGARD TO CONFLICT OF LAWS PRINCIPLES THEREOF.

Section 3.04    CONSENT TO JURISDICTION. ALL JUDICIAL PROCEEDINGS BROUGHT AGAINST ANY PARTY HERETO ARISING OUT OF OR RELATING HEREUNDER, OR ANY OF THE OBLIGATIONS, MAY BE BROUGHT IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE, COUNTY AND CITY OF NEW YORK. BY EXECUTING AND DELIVERING THIS AGREEMENT, EACH PARTY HEREUNDER, FOR ITSELF AND IN CONNECTION WITH ITS PROPERTIES, IRREVOCABLY (a) ACCEPTS GENERALLY AND UNCONDITIONALLY THE EXCLUSIVE JURISDICTION AND VENUE OF SUCH COURTS; (b) WAIVES ANY DEFENSE OF FORUM NON CONVENIENS; (c) AGREES THAT SERVICE OF ALL PROCESS IN ANY SUCH PROCEEDING IN ANY SUCH COURT MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED, TO THE APPLICABLE PARTY AT ITS ADDRESS PROVIDED IN ACCORDANCE WITH SECTION 3.01; (d) AGREES THAT SERVICE AS PROVIDED IN CLAUSE (c) ABOVE IS SUFFICIENT TO CONFER PERSONAL JURISDICTION OVER THE APPLICABLE PARTY HERETO IN ANY SUCH PROCEEDING IN ANY SUCH COURT, AND OTHERWISE CONSTITUTES EFFECTIVE AND BINDING SERVICE IN EVERY RESPECT; AND (e) AGREES EACH COLLATERAL AGENT RETAINS THE RIGHT TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO BRING PROCEEDINGS AGAINST ANY PARTY HEREUNDER IN THE COURTS OF ANY OTHER JURISDICTION.

Section 3.05    WAIVER OF JURY TRIAL. EACH OF THE PARTIES HEREUNDER HEREBY AGREES TO WAIVE ITS RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING HEREUNDER OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT. THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT

NY\1087263.5

RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS. EACH PARTY HEREUNDER ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO A BUSINESS RELATIONSHIP, THAT EACH HAS ALREADY RELIED ON THIS WAIVER IN ENTERING INTO THIS AGREEMENT, AND THAT EACH WILL CONTINUE TO RELY ON THIS WAIVER IN ITS RELATED FUTURE DEALINGS. EACH PARTY HERETO FURTHER WARRANTS AND REPRESENTS THAT IT HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL AND THAT IT KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE, MEANING THAT IT MAY NOT BE MODIFIED EITHER ORALLY OR IN WRITING (OTHER THAN BY A MUTUAL WRITTEN WAIVER SPECIFICALLY REFERRING TO THIS SECTION 3.05 AND EXECUTED BY EACH OF THE PARTIES HERETO), AND THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS HERETO. IN THE EVENT OF LITIGATION, THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL BY THE COURT.

NY\1087263.5

IN WITNESS WHEREOF, Consultant, Holdings and the Collateral Agents have caused this Agreement to be duly executed and delivered by their respective officers thereunto duly authorized as of the date first written above.

MICHAEL DEL CASTELLO
as Consultant

By: _____
    Name:
    Title:

MDC HOLDING INVESTMENTS, LLC,
as Holdings

By: _____
    Name: Joseph Brownell
    Title: President and Chief Executive Officer

D.B. ZWIRN SPECIAL OPPORTUNITIES FUND, L.P.,
a  Delaware limited partnership,

By: D.B. Zwirn Partners, LLC, its general partner

By: Zwirn Holdings, LLC, its managing member

as Asset Based Collateral Agent

By:_____

     Name:  Perry A. Gruss
     Title:   Chief Financial Officer


D.B. ZWIRN SPECIAL OPPORTUNITIES FUND, L.P.,
a  Delaware limited partnership,

By: D.B. Zwirn Partners, LLC, its general partner

By: Zwirn Holdings, LLC, its managing member

as Tranche A Collateral Agent

By:_____

     Name:  Perry A. Gruss
     Title:   Chief Financial Officer


D.B. ZWIRN SPECIAL OPPORTUNITIES FUND, L.P.,
a  Delaware limited partnership,

By: D.B. Zwirn Partners, LLC, its general partner

By: Zwirn Holdings, LLC, its managing member

as Tranche B Collateral Agent

By:_____

     Name:  Perry A. Gruss
     Title:   Chief Financial Officer

SPOUSAL CONSENT

The undersigned is the spouse of Michael Del Castello, the Consultant named in the foregoing Consulting Fee Subordination Agreement. The undersigned hereby acknowledges that he or she has reviewed the Consulting Fee Subordination Agreement and understands its provisions and hereby agrees to be bound by each and every term and condition of the Consulting Fee Subordination Agreement to which the undersigned's spouse is bound and to the same extent, including, but not limited to, those terms and conditions relating to the subordination of the Subordinated Fee. The undersigned confirms that the Subordinated Fee and his or her interests in it, are subject to the provisions of the Consulting Fee Subordination Agreement and agrees that he or she will take no action at any time to hinder the operation of, or violate, the Consulting Fee Subordination Agreement.


_____
Signature


Patricia Del Castello
Print Name

PATRICIA  Dei CASTELLO

14

EXHIBIT A

CONSULTING AGREEMENT

PAYMENTS OF ANY AND ALL FEES, EXPENSES AND ANY OTHER AMOUNTS HEREUNDER ARE EXPRESSLY SUBORDINATED AND SUBJECT IN RIGHT OF PAYMENT TO THE PRIOR PAYMENT IN FULL OF CERTAIN SENIOR DEBT PURSUANT TO, AND TO THE EXTENT PROVIDED IN, THE CONSULTING FEE SUBORDINATION AGREEMENT, DATED AS OF DECEMBER 9, 2005, AMONG THE COMPANY, CONSULTANT AND D.B. ZWIRN SPECIAL OPPORTUNITIES FUND L.P.

### CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (this "**Agreement**") made this 9th day of December, 2005 is entered into by MDC Holding Investments, LLC, a Delaware limited liability company (the "**Company**"), and Michael Del Castello ("**Consultant**").

### RECITALS

A.    This Agreement is made and entered into in connection with the consummation of the transactions contemplated by that certain Contribution and Purchase Agreement dated as of December 9, 2005 (the "**Purchase Agreement**") entered into by and among the Company, Consultant, Jose Contin and MDC Vacuum Products Corporation ("**MDC**"). All capitalized terms used herein and not defined herein shall have the meanings given to such terms in the Purchase Agreement.

B.    Consultant is a former executive of the business owned by the Company.

C.    The Company desires to engage Consultant and Consultant desires to be engaged by the Company.

In consideration of mutual covenants and promises contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

### AGREEMENTS

1.    **Term of Agreement:**  Consultant will provide the Services (as defined below) to the Company for a period of six (6) years from the date hereof, subject to termination as set forth below.

2.    **Services:**  During the term of this Agreement, Consultant will provide consulting services to the Company as may be reasonably requested by the Company's President, and reasonably approved by Consultant, from time to time (the "**Services**"). Consultant shall perform the Services principally from his home office in Vancouver, Washington, subject to such reasonable travel as may be required, and shall not be required to relocate his residence. Consultant shall be required only to devote such time to performance of the Services as the Company shall reasonably require; provided, however, that Consultant shall not be required to be present and working on the premises of the Company more than five (5) consecutive business days per month. The Company shall not be required to make available to Consultant a private office at its place of business.

3.    **Fees:** In consideration of Consultant's provision of the Services hereunder, the Company will (a) pay Consultant an annual fee of $200,000, payable on the last day of each month in equal monthly installments, (b) pay Consultant's COBRA payments for 18 months following the date hereof (the **"COBRA Coverage Period"**) and (c) pay Consultant's health insurance premiums for 18 months following the COBRA Coverage Period in an amount per month not to exceed the COBRA payment for the final month of the COBRA Coverage Period. Consultant shall be responsible for the payment of all taxes of any kind or nature imposed with respect to or in connection with the compensation payable to Consultant pursuant to this Agreement, including without limitation, income, withholding, employment, FICA, state or local taxes (collectively, **"Taxes"**). Consultant shall indemnify the Company and any affiliates thereof with respect to any Taxes described in the previous sentence, related interest and penalties, and any costs of defense (including without limitation, attorneys and accountants fees) related thereto. The obligation set forth in this Section 3 shall survive any termination of this Agreement.

4.    **Reimbursement of Expenses:** The Company will reimburse Consultant for all necessary and reasonable business expenses incurred or paid by Consultant in connection with, or related to, the performance of the Services under this Agreement (excluding costs of travel between any of Consultant's residences and the Company's place of business, which shall be borne solely by Consultant), upon presentation by Consultant of documentation, expense statements, vouchers, and/or other supporting information as the Company may reasonably request; <u>provided</u>, that the Company shall not be required to reimburse Consultant for any expenses unless such expenses have been approved in writing by the Company's President prior to incurrence.

5.    **Death or Incapacity:** In the event that (a) Consultant becomes physically or mentally disabled or incapacitated such that it is the reasonable, good faith opinion of the Company that Consultant is unable to perform the services required under this Agreement, then after four (4) months of continuous physical or mental disability, or (b) Consultant dies during the term hereof, then upon such death, Consultant's engagement to provide the Services hereunder and all of the Company's obligations hereunder shall terminate immediately, except that the Company shall continue to pay Consultant the consulting fees to which he would be entitled under Section 3 hereof but for such termination on the schedule provided in Section 3 hereof, and the Company shall reimburse Consultant for any expenses incurred prior to the date of termination that it is required to reimburse pursuant to Section 4 hereof. For purposes of this Agreement, physical or mental disability does not include any disability arising from alcoholism, drug abuse, or related issues.

6.    **Termination by the Company For Cause:** The Company may terminate Consultant for cause. If Consultant is terminated for cause, all of the Company's obligations hereunder shall terminate immediately, except that the Company shall be obligated to pay or accord to Consultant the consulting fees earned through the date of termination pursuant to Section 3 hereof and reimburse any related expenses as set forth in Section 4 hereof. Cause is defined as:

(a)    conviction, including by plea of guilty or no contest, of any crime involving dishonesty;

(b)    participation in any fraud or act of dishonesty against the Company;

(c)    intentional damage to any property of the Company;

(d)    gross misconduct; or

(e)    a material breach of this Agreement or any other written agreement between Consultant or any of his affiliates, on the one hand, and the Company and any of its affiliates, on the other hand, which material breach is not cured within ten (10) days after notice thereof.

7.    **Termination by the Company Other Than for Cause, Death or Disability:**  If the Company terminates Consultant's engagement to provide Services hereunder for any reason other than death or disability pursuant to Section 5 hereof or cause pursuant to Section 6 hereof, the Company shall continue to pay Consultant the consulting fees to which he would be entitled under Section 3 hereof but for such termination on the schedule provided in Section 3 hereof, and the Company shall reimburse Consultant for any expenses incurred prior to the date of termination that it is required to reimburse pursuant to Section 4 hereof.

8.    **Independent Contractor; No Authority to Bind Company**.  Consultant's relationship with the Company under this Agreement will be that of an independent contractor and not that of an employee, joint-venturer or partner.  Neither Consultant, nor any affiliate, partner, agent or employee of Consultant, has authority to enter into contracts that bind the Company or create obligations on the part of the Company without the prior written authorization of the Company, and it shall be deemed a material breach of this Agreement if Consultant or any affiliate, partner, agent or employee of Consultant purports to do so.

9.    **Confidential Information:**  The Company has and will continue to spend significant time, effort and money to develop proprietary information which is vital to the Company's business.  In the course of Consultant's provision of the Services to the Company, he will acquire certain proprietary information.  Consultant agrees that he will not disclose or utilize any confidential or proprietary information (not already otherwise made public or already in possession of the person to whom it was disclosed) or trade secrets to any competitor of the Company or any other person or entity outside the Company other than the agents representatives or consultants acting on behalf of the Company.  Any confidential materials that come into Consultant's possession during his employment shall remain the exclusive property of the Company and shall be promptly returned to the Company upon any termination of this Agreement.

10.    **Subordination:**  This Agreement, and all amounts payable hereunder, shall be subject to customary forms of subordination agreements requested from time to time by holders of Senior Indebtedness and, upon the request of the Company from time to time, Consultant agrees to execute and deliver to the Company such forms of subordination agreements in favor of the holders of Senior Indebtedness.  **"Senior Indebtedness"** means any and all principal of, premium, if any, and interest on indebtedness of the Company or any subsidiary pursuant to the Credit and Guaranty Agreement, dated as of December 9,

2005, among MDC Vacuum Products, LLC, the Company and D.B. Zwirn Special
Opportunities Fund, L.P., and the Credit Documents (as defined therein), and any
amendments, supplements, restatements, replacements, renewals, refinancings, waivers or
modifications thereof.

    11.    **Separability:** Each provision of this Agreement is separable and
independent of the other provisions. If any part of this Agreement is found to be invalid, the
remainder shall be given full force and effect as permissible by law.

    12.    **Complete Agreement:** This Agreement constitutes the entire agreement
between Consultant and the Company regarding the subjects covered by this Agreement.
No other agreement, understanding, statement or promise other than those contained in this
Agreement will be effective. Any modification of this Agreement will be effective only if it
is in writing and signed by the parties.

    13.    **Governing Law:** This Agreement will be governed and construed consistent
with the laws of the State of California.

    14.    **Notice:**

    (a)    All notices and other communications given or made pursuant hereto shall be
in writing and shall be deemed to have been duly given or made as of the date delivered or
mailed if delivered personally or mailed by registered or certified mail (postage prepaid,
return receipt requested), or sent by facsimile transmission (confirmation received), to the
parties at the following addresses and facsimile transmission numbers (or at such other
address or number for a party as shall be specified by like notice), except that notices after
the giving of which there is a designated period within which to perform an act and notices
of changes of address or number shall be effective only upon receipt:

    (a)    if to Consultant, to:

Michael Del Castello
5401 S.E. Scenic Lane
Unit 104
Vancouver, WA 98661
Telecopy No.: (360) 609-7545

with a copy to:

MBV Law LLP
855 Front Street
San Francisco, CA 94111
Attention: William Mandel, Esq.
Telecopy No.: (415) 433-6563

    (b)    if to the Company, to:

MDC Holding Investments, LLC
23842 Cabot Blvd.

1389674.9

    - 4 -

Hayward, CA 94545
Attention: Joseph Brownell
Telecopy No.: (510) 265-3615

with a copy to:

Irell & Manella LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067
Attention: Mitchell Cohen
Telecopy No.: (310) 203-7199

    15.    **Counterparts.** This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together will constitute one and the same instrument.

*[signatures page follows]*

IN WITNESS WHEREOF, the parties hereto have executed this Consulting Agreement the day and year first above written.

**MDC HOLDING INVESTMENTS, LLC**          **CONSULTANT:**

By: _____               _____
Name: Joseph Brownell                        Michael Del Castello
Title: President and Chief Executive Officer